(No. 12182.—Reversed and remanded.)

THE CITY OF CHICAGO, Appellee, vs. EDWARD MULLIN,
Exr., et al. Appellants.

*Opinion filed October 21, 1918—Rehearing denied Dec. 5, 1918.*

1. EMINENT DOMAIN—*what evidence as to sales of other lots is admissible.* In a proceeding to condemn vacant land a witness may testify, subject to proper cross-examination, as to comparatively recent sales by him of lots in nearby subdivisions, even though some of the sales were to relatives of the witness and involved commissions to him.

2. SAME—*nearness of time and place is not so important where sales are of industrial property.* In a condemnation proceeding, in proving sales of other property on the question of the value of the land condemned, greater latitude as to nearness of time and place should be allowed where the sales are of industrial properties than where they are of residence lots.

3. SAME—*when evidence of sales of industrial property should be admitted.* Where the theory of the owner of land sought to be condemned is that its most valuable use, owing to its location near a belt line railroad, is for industrial purposes, evidence of sales of industrial property made, respectively, four and two and one-half years before the trial and at locations one and one-half and four miles from the land condemned, should be admitted if there is no other evidence of such sales nearer in point of time and location.

4. SAME—*what evidence as to special assessments is admissible.* In a proceeding by a city to condemn vacant land, the defendants are entitled, on cross-examination of a witness for the city, to have him state, if he knows, the amount of special assessments chargeable to the land condemned for improvements he has testified have been put in.

5. SAME—*sale of property for its best use does not make it an extraordinary sale.* The fact that the price of property for its highest and best use is its greatest market value does not make such a sale a special sale or one made under extraordinary circumstances.

6. SAME—*jury may consider adaptability for switch-track facilities though no switch track has been built.* Where vacant property sought to be condemned is located near a belt line railroad and the defendant claims its best use is for industrial purposes, the jury may consider the adaptability of the property for switch-track facilities even though there was no switch track to the particular property at the time the petition was filed.

Appeal from the Circuit Court of Cook county; the Hon. Jesse A. Baldwin, Judge, presiding.

Donald L. Morrill, for appellants.

Charles R. Francis, Morton S. Cressy, and John A. Cooke, for appellee.

Mr. Justice Carter delivered the opinion of the court:

This was a condemnation proceeding brought in the circuit court of Cook county by appellee to acquire for school purposes a tract of land containing 10.38 acres, situated in the southwestern part of the city of Chicago. On the trial before a jury in that court a verdict of $30,000 was awarded as full compensation for the land sought to be condemned. The court entered judgment on the verdict, and an appeal has been prosecuted to this court by appellants to review the proceedings in the trial court.

The tract of land is vacant and is bounded on the north by West Eighteenth street, on the east by South Keeler avenue, on the south by West Nineteenth street extended, and on the west by South Kildare avenue extended. At the time of the trial it was not subdivided. While there is some subdivided land on one side of it immediately adjoining, most of the adjoining land was vacant July 19, 1917, the date the petition in this case was filed. The nearest buildings were northeast, diagonally across the street from this property. All of the territory to the northeast was fairly well built up with brick cottages and flats. About a block south of Twentieth street the vicinity was fairly built up with brick cottages and flats for some distance. Immediately west of this tract to Forty-sixth avenue, along which is located the Belt Line railroad, and immediately north of the tract for two blocks, the property was vacant. There was a large excavation or clay hole of the Illinois Brick Company to the north of the western half of the tract. Several

factories were located and in operation near the Belt Line in that neighborhood. Most of the east and west streets near this tract did not cross the Belt Line, the railroad being elevated at that locality, there being also railroad yards adjacent to it, as shown by the plat. The Douglas Park branch of the Metropolitan Elevated Railroad Company runs a block and a half south of the property and has a passenger station almost opposite. Crawford avenue, two blocks east, has a cross-town car line, east of which the territory is practically all built up with residences. The only street improvements adjacent to the property were on Keeler avenue, which has an asphalt pavement, sidewalk, water and sewer. Nineteenth street was not extended through east and west nor Kildare avenue north and south.

Five real estate dealers testified for appellee, all of them apparently well qualified by experience in buying and selling, collecting, renting and making loans, and some of them in making valuations for residence property in that neighborhood. Some of them had experience, also, as to industrial property. These five witnesses all testified that the best use to which the property could be put was for residential purposes, and some of them placed its market value at from $2500 to $3000 an acre. Appellants introduced four witnesses who had had many years' experience in selling property for industrial purposes in and about Chicago. They testified that the best use for this property was for industrial purposes, and that for those purposes it was fairly worth in open market between $5500 and $7500 an acre. Appellants introduced in evidence an ordinance passed by the city authorities of Chicago giving permission to the Belt Line Railroad Company to build a switch track connecting with that railroad at Sixteenth street and extending to the north of Eighteenth street as far as Keeler avenue, but neither this ordinance nor any other proof showed that permission had been granted by the city authorities to cross Eighteenth street. The switch track was not constructed at

the time of the hearing. Some of these witnesses for appellants testified if the switch track were actually constructed the property in question would be more valuable than the amount they had testified to. These witnesses for appellants all testified that they were not familiar with the value of this property for residential purposes.

A reading of the testimony of the witnesses indicates that the difference of opinion as to the value of this land arose largely, if not wholly, from their different views as to the use to which it was best adapted. While some of the witnesses for appellee had sold property for industrial purposes, their experience was largely in connection with the sale and use of land for residential purposes. With perhaps one exception all the witnesses for appellants had little or no experience with the sale of property for residences but all their experience was with reference to sales of tracts for industrial uses. In cases of this kind, where the evidence is conflicting and the jury viewed the premises, as they did here, the courts will not interfere with their finding as to the amount of damages for the property taken unless there is something in the record showing that they have been influenced by passion or prejudice in reaching their verdict or that there has been some incorrect ruling of law by the trial court that might have misled them. *Sexton* v. *Union Stock Yards Co.* 200 Ill. 244; *Lanquist* v. *City of Chicago,* 200 id. 69.

Counsel for appellee introduced certain evidence as to the sale of lots for residential purposes in the vicinity of this tract. One of these real estate men, Kunstman, testified to the sale of certain lots by him not far from this property for $1800 a lot, and on cross-examination testified that he had purchased them at $1200 a lot; that a broker came to him at the time he purchased them and said he had some cheap lots out on the southwest side, "and I said, 'How cheap?' 'Well,' he says, 'these people want money and you make an offer.' I offered him $1200 and he accepted it."

If this testimony had been offered by appellee on direct examination and objection made to it we think it should not have been admitted, but it was drawn out by counsel for appellants on cross-examination, and we do not see how appellants are in a condition to object to it, considering the circumstances under which it was introduced.

Another witness, Kirchman, testified for appellee as to certain sales he had made from 1913 to 1916 in an adjacent subdivision. Kirchman was the president of a bank, and some of these sales were made to his son-in-law, Jedland, cashier in Kirchman's bank, and some of them to a clerk in the bank, and it was insisted at the trial that these sales should not have been admitted in evidence. It appears from the evidence, however, that Kirchman was the sub-agent in the sale of these lots and that all sales before consummated were approved by the principal agent, E. A. Cummings, who had charge of the sale of all the lots in the subdivision. Evidence of sales, to be of value, should be of voluntary sales for cash in the open market, when the seller is willing to sell and the buyer is willing to buy, with no compulsion on either side. The degree of similarity which must exist between the property concerning which proof is offered and the property taken, and the nearness in respect to time and distance, cannot be governed by fixed rules. Such questions must, of necessity, rest very largely within the sound discretion of the trial judge. (2 Lewis on Eminent Domain,— 3d ed.—sec. 662; *Chicago and Western Indiana Railroad Co.* v. *Heidenreich,* 254 Ill. 231; *Sanitary District* v. *Boening,* 267 id. 118.) The principal objection to Kirchman's evidence is that the sales were not free sales in open market, as commissions were involved, and some of the sales were to relatives. This court, in discussing a similar question in *Dady* v. *Condit,* 209 Ill. 488, said (p. 493) : "In those sales which are said to have been on time, part, only, of the purchase price was deferred and such deferred payments bore six per cent interest, and while the point to be arrived at

by the jury was the actual cash value of the land in con-
troversy at a certain time, we think that evidence of other
sales of the character testified to might furnish some cri-
terion valuable to the jury in fixing such cash value; and
such evidence would also furnish a means of testing the
value and weight to be given the testimony of appellee's
witnesses who swore as to the actual cash value of the land.
If evidence were to be excluded of all sales every cent of
which was not cash the door would practically be closed as
to the evidence of other sales, and such evidence, when of
similar land in the same community, has always been re-
garded as the most satisfactory. We think the evidence as
to the other sales was clearly competent, but, of course, the
value of such evidence was for the jury, and appellant had
the right, by cross-examination, to elicit all the unfavorable
facts connected with such sales and thus minimize as much
as he could the weight of such evidence." The same thing
may be said here as to the evidence of the sales testified to
by Kunstman, and especially by Kirchman. Counsel for
appellants by cross-examination brought out from the wit-
ness Kirchman most, if not all, of the facts objected to.
We are of the opinion that no error was committed by the
court in its admission of the evidence in question.

Counsel for appellants further contends that the trial
court erred in refusing to admit evidence of sales of in-
dustrial property offered on their behalf even though the
property was located some distance from the property in
question, there being no evidence of industrial sales closer
in time or distance than that thus offered by them. Wit-
ness W. S. Adams testified for appellants that he had made
actual sales of property for industrial purposes in Chicago
and from his experience with reference to those matters
testified as to the value of this property. He testified that
a number of these sales had been made by him in Chicago.
One of them was of a tract of land about one and one-half
miles north of this property, near Polk street and Forty-

sixth avenue, four years previous to this trial. Another was at Forty-sixth and Grand avenues, at the Belt Line, four miles from this property, made two and one-half years previous. Another was several years before, near Belmont and Kimball avenues, several miles north of this property. The admissibility of evidence of this character, offered on the trial of a condemnation case on the ground that it tends to prove the value of the land taken, depends largely on the question whether such other land is sufficiently like the land in controversy and the sale sufficiently near, in point of time and locality, to make such evidence helpful to the jury in fixing the fair cash market value of the property in question. The question whether such evidence is admissible is one of fact, to be decided first by the trial court, and, as already stated, the admissibility of such evidence is largely within the sound discretion of the trial judge. This discretion, however, is not unlimited but must be a sound judicial discretion, and if the evidence offered and excluded was fairly admissible under the law the reviewing court should so hold. (2 Nichols on Eminent Domain,—2d ed.— sec. 457.)

A reference to some of the decided cases will perhaps best illustrate the law upon the subject. If the question is one as to ordinary building lots for residential purposes the exact situation of the different lots with respect to each other may be of considerable importance, but when the value of the land depends upon its situation with reference to railroads and its adaptability to be connected thereto by switch tracks the question of the immediate locality of the property may not be as important. In a proceeding to assess damages for a portion of Long Island, in Boston harbor, taken by the United States, evidence was received of sales of similar lands upon islands and headlands in and about Boston harbor from half a mile to six miles distant and ranging from one to eight years back. The Supreme Court of Massachusetts in passing on this question in *Ben-*

*ham* v. *Dunbar*, 103 Mass. 365, said (p. 369) : "If the value of a town lot was in question, it is plain that the evidence should be confined to sales of comparatively recent date and of land in the near vicinity. If it was wild land, in a thinly settled part of the country, a more liberal rule would be applicable," and the evidence of these sales was held properly admissible. In a proceeding to condemn land which was shown to be suitable for raising cranberries and situated on the Charles river, a witness was permitted to testify for what amount he sold similar land situated across the river and in another town, some three or four years before, and this ruling was upheld in *Gardner* v. *Brookline*, 127 Mass. 358. In a proceeding by the United States to condemn land for the national park at Gettysburg it was held incompetent to show what the government had paid for lands for other similar parks at Chickamauga and Antietam. (*Five Tracts of Land* v. *United States*, 101 Fed. Rep. 661.) A review of the authorities and discussion of their applicability is found in 2 Lewis on Eminent Domain, (2d ed.) sec. 662, and 2 Nichols on Eminent Domain, (2d ed.) sec. 457.

It is clear from a consideration of the authorities that a very different practice should be followed with reference to the proof of sales of industrial property and large tracts, as to nearness of location or even nearness of time, than would be followed as to the sale of farm lands or building lots. The proof in the record shows no sales nearer to this property than those offered to be proved by the witness Adams. This being so, by reason and authority the evidence as to the amount paid on the sale of land near Polk street and Forty-sixth avenue should have been admitted, and also the evidence as to the amount paid for the land at Grand and Forty-sixth avenues. As to whether the other sale should have been admitted we are not prepared to decide, as we do not consider the testimony in the record sufficiently explicit or definite to enable us to do so satisfac-

torily. From the proof in the record we think it is clear that the location of land for industrial purposes, so far as railroad and switching facilities are concerned, does not depend so much upon the exact location in reference to the down-town business district or other business district as it does upon its location with reference to railroad tracks where such switching facilities can readily be obtained. We think the proof tends to show that the Belt Line here in question would furnish advantageous switching and railroad facilities for almost any industrial enterprise.

Counsel for appellants also argues that the court erred in refusing to allow a witness for the city of Chicago, on cross-examination, to testify as to the portion of special assessments which was fairly chargeable to the property included in this petition. It appears from the testimony of this witness that certain improvements had been instituted and had been put in by special assessment proceedings, assessing the tract here in question along with other property, and that a part of the assessment testified to by this witness was included along with the assessment of certain property that was not included in this petition for condemnation. Witness testified that he knew the total amount of these assessments, but the court refused to permit him to testify as to this total amount. Under the reasoning of this court in *West Chicago Park Comrs. v. Boal,* 232 Ill. 248, the evidence sought from this witness on cross-examination was admissible and the court erred in not permitting the witness to answer. The error, on this record, however, was not of such a serious character as to justify a reversal on that question, alone.

Counsel for appellants further earnestly argues that the court misled the jury in the giving and refusing of instructions. He argues that the instructions given emphasized the theory of the city at the trial that the prices testified to by witnesses for appellants as to industrial values were fanciful or speculative, and that the property would sell for such

·purposes only under special or extraordinary circumstances. He argues that because of the giving of these instructions for appellee, several of them referring to·speculative or fanciful values, and because of the refusing of certain instructions asked on behalf of appellants, the jury did not have before them, as they should have had, the theory of appellants as to why they should be allowed industrial values. Among other instructions asked by appellants and refused is one that stated that while the price at which property would sell for the highest and best purpose in the market is its greatest market value, yet this does not make a sale for that purpose a sale made under special or extraordinary circumstances; and another instruction which stated that if the jury believe, from the evidence, that on the date the petition was filed the highest and best use to which the property was adaptable was an industrial use, then, in determining the just compensation to be paid, the jury should fix the value of the property for that purpose as shown by the evidence. We are of the opinion that the first refused instruction just referred to should have been given. The last was given but modified by the court by inserting after the word "industrial" the word "residential." We do not think the jury were misled by the modification.

Complaint is also made of the refusal by the court to give certain instructions which stated that even though at the time when the petition was filed there was no switch track running to this particular property, still if the jury believe, from the evidence, that such property was available for industrial purposes and for switch track property uses, and if the jury believe, from the evidence, that its value in the market on said date would be enhanced by such availability and adaptability, they have a right to consider such elements in fixing the verdict. We think these instructions fairly stated the law applicable to appellants' theory of the case as to the switch track use. (*South Park Comrs.* v. *Ayer,* 237 Ill. 211.) Another instruction was given on be-

285 — 20

half of appellants which stated in different language, perhaps not quite so clearly, appellants' theory as to the adaptability of this property for switch track purposes,· even though the switch track had not been built at the time the petition was filed, therefore the refusal of these instructions as to switch track facilities was not reversible error.

The testimony of the witnesses for appellants and appellee was so widely divergent on the value of this tract of land that we are of the opinion the refusal to admit the testimony as to the industrial sales, together with the emphasis placed in the instructions upon special and extraordinary circumstances and fanciful or speculative values, and the refusal of certain instructions asked by appellants on these last questions, misled the jury as to the rules that should control with reference to fixing the value of the property condemned. For these reasons the judgment of the circuit court will be reversed and the cause remanded for further proceedings in harmony with the views herein expressed.

*Reversed and remanded.*